Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 50326 | **DATE** | 6/3/2002 |
| **CASE TITLE** | St. Paul Medical Liability Ins. Co. vs. Bell, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

St. Paul's and the Trustees' cross-motions for summary judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, the Trustees' motion for summary judgment is granted in favor of the Trustees on their counterclaim and Count I of St. Paul's complaint; conversely, St. Paul's motion for summary judgment is denied as to Count I of its complaint but granted as to Counts II-IV. St. Paul is found liable on the bond it issued in favor of the Trustees; Kaney, KTI, Kovanda, and Moats are found liable to St. Paul for any losses, including attorney's fees, St. Paul has incurred in executing the bond. The parties are ordered to file a stipulation within fourteen days from the date of this order regarding (1) the total amount owing on the bond and (2) the total amount of losses, including costs and attorney's fees, St. Paul has incurred in executing the bond. If the parties are unable to so stipulate, counsel shall appear at a status hearing at 9:00 a.m. on Wednesday, June 19, 2002.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | JUN - 4 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 6-3-02 | |
| | | 2002 JUN -3 PM 4:13 | date mailed notice | |
| /LC | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

ST. PAUL MEDICAL LIABILITY )
INSURANCE COMPANY, )
 )
     Plaintiff, )
 )
  v. ) No. 00 C 50326
 )
RONALD BELL and MARY BELL as )
Trustees of THE BELL TRUST DATED )
DECEMBER 18, 1995, JERE EYER and )
ALISON EYER as Trustees of THE )
EYER TRUST NO. 98-1 DATED JULY 10, )
1998, KANEY TRANSPORTATION, INC., )
KTI HOLDINGS, INC., LOUIS KOVANDA, )
and EUGENE P. MOATS, )
 )
     Defendants. )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Plaintiff, St. Paul Medical Liability Insurance Company ("St. Paul"), has filed a four-count complaint against defendants. In Count I, St. Paul seeks the discharge of a bond it issued in favor of Ronald and Mary Bell as Trustees of the Bell Trust Dated December 18, 1995, and Jere and Alison Eyer as Trustees of the Eyer Trust No. 98-1 dated July 10, 1998 (collectively referred to as "the Trustees"). If the court finds the bond is not discharged, St. Paul alternatively requests Kaney Transportation, Inc. and KTI Holdings, Inc. (collectively referred to as "Kaney"), Louis Kovanda, and Eugene P. Moats be ordered to post collateral sufficient to cover its losses on the

bond and to reimburse it for the costs and expenses it has incurred in executing the bond (Counts II - IV). The Trustees have counterclaimed against St. Paul for payment on the bond. As St. Paul is incorporated with its principal place of business in Minnesota, all of the individual defendants are Illinois citizens, all of the corporate defendants are incorporated with their principal places of business in Illinois, and the amount in controversy exceeds $75,000, diversity jurisdiction is proper under 28 U.S.C. § 1332. Venue is proper as a substantial portion of the events giving rise to the claims occurred in this district and division. See id. § 1391(a)(2). Before the court are cross-motions for summary judgment, filed by St. Paul and the Trustees pursuant to Federal Civil Rule of Procedure 56.

## II. BACKGROUND

When it was in operation, Kaney's primary business was transporting fuel oil. (Bell & Eyer LR 56.1(a) ¶ 1) Up until March 1999, Bell and Eyer together owned 100% of Kaney's stock.[1] (Id. ¶ 4) Then entered Kovanda and Moats, who offered to buy a majority interest in Kaney as part of a leveraged buy out. Bell and Eyer agreed and, without sweating the details, the deal worked like this. Bell and Eyer were to give Kovanda and Moats a combined 69% interest in Kaney (while retaining the remaining 31%

---

[1] Technically Bell and Eyer's respective trusts actually owned the stock, but this is a detail the court will ignore for simplicity's sake.

interest, split equally between Bell and Eyer), and in return Kaney would pay Bell and Eyer a total of $11 million. (Id. ¶ 12; St. Paul LR 56.1(a) ¶ 14) Kaney financed $7 million of this amount by taking out a loan at Harris Trust and Savings Bank ("Harris"), a loan which also included a $1 million line of credit for Kaney. (Bell & Eyer LR 56.1(a) ¶ 29; St. Paul LR 56.1(a) ¶ 14) Another $1 million took the form of a residual payment made directly from Kaney to Bell and Eyer. (Bell & Eyer LR 56.1(a) ¶ 12; St. Paul LR 56.1(a) ¶ 14) And – what is important for this case – for the final $3 million Bell and Eyer accepted a promissory note from Kaney to be paid in monthly installments over 60 months with interest. (Bell & Eyer LR 56.1(a) ¶ 12; St. Paul LR 56.1(a) ¶ 14)

Because of the risk involved in the buy out, Bell and Eyer insisted the $3 million promissory note be secured by a surety bond. (Bell & Eyer LR 56.1(a) ¶ 14) To that end, Kovanda and Moats obtained an indemnity bond from St. Paul (actually one of St. Paul's predecessors, but that is another detail that can be ignored) to cover the installment payments over the five years of the note's duration. (Id. ¶¶ 15-16; St. Paul LR 56.1(a) ¶¶ 10, 14-15) The bond named Kaney as the principal, the Trustees as obligees, and included an indemnity agreement requiring Kaney, Kovanda, and Moats to indemnify St. Paul for any losses it incurred in executing the bond as well as requiring the indemnitors to post upon demand sufficient collateral to cover

-3-

such losses. (St. Paul LR 56.1(a) ¶¶ 11-13, 30)

Part of the buy out agreement also included a condition that "any compensation, remuneration, debt payments . . . or other financial consideration or entitlements of any kind" could not be made by Kaney to Kovanda or Moats, or any entity or company owned by them, without the prior written consent of Bell and Eyer, which could not be "unreasonably withheld." (Id. ¶ 17) Soon after the closing Kovanda and Moats began putting this provision to the test. At a directors meeting held on April 30, 1999, Kovanda moved that Kaney pay monthly directors fees to the six members of Kaney's board of directors, which was composed of Bell, Eyer, Kovanda, Moats, and two other individuals named Chris Jansen and Gilbert Granet who had originally approached Bell and Eyer with the buy out offer on behalf of Kovanda and Moats. (Bell & Eyer LR 56.1(a) ¶¶ 7-9, 81, 83) Although the evidence is somewhat conflicting on how much the fees were or how forcefully Eyer objected to them, it is undisputed that Eyer raised some concern during the meeting about how the fees would impact Kaney's compliance with the Harris loan agreement. (Id. ¶ 86; St. Paul LR 56.1(b)(3)(A) Resp. Exh. 2(B), Bates No. E 04275) In the end the board unanimously approved the payment of directors fees. (St. Paul LR 56.1(b)(3)(A) Resp. ¶ 84)

Then on May 6, 1999, Kovanda called Eyer to ask that $100,000 be wire transferred from Kaney's line of credit with Harris to Premier Tank Lines ("Premier"), an Ohio fuel trucking

company owned entirely by Kovanda and Moats. (Bell & Eyer LR 56.1(a) ¶ 87; St. Paul LR 56.1(a) ¶ 18) Eyer initially refused but subsequently acquiesced to the transfer. (Bell & Eyer LR 56.1(a) ¶ 90) A few months later, in September 1999, Kovanda made a similar request, this time asking for $80,000. (Id. ¶ 94) After some cajoling by Kovanda about how advancing the money to Premier was in Kaney's best interest because of a shared customer (more on this below), Eyer approved the transfer. (Id.)

Things finally came to a head in the Fall of 1999 when Kovanda, Moats, Bell, and Eyer had a meeting with representatives from Harris to discuss not only the $180,000 Kaney had loaned Premier without Harris' knowledge or prior authorization, but also the possibility of Kaney loaning Premier an additional $500,000. (Id. ¶¶ 108-111, 165) Both Bell and Eyer were strongly opposed to giving Premier another $500,000, and Harris was reluctant as well, but Kovanda insisted the loan was necessary to avoid jeopardizing Kaney's relationship with Marathon Oil Corporation ("Marathon"), which Harris knew was one of Kaney's key customers and accounted for somewhere between 30-50% of Kaney's business at the time. (Id. ¶¶ 79, 119-22, 159, 163; St. Paul LR 56.1(a) ¶ 20) As Kovanda explained the situation, Premier needed the $500,000 loan to stay afloat and keep Marathon, which was also one of Premier's major customers, happy. The reason this was so critical to Kaney, according to Kovanda, was that Marathon knew Kovanda owned Premier and had a

controlling interest in Kaney (because Kovanda himself had told
Marathon this), so if Kaney refused to give Premier the money it
needed to stay in business, leaving Marathon without anyone to
service it in the Ohio market, then Marathon would retaliate by
cutting off its ties with Kaney in the Chicago area.  (Bell &
Eyer LR 56.1(a) ¶¶ 94, 113-15, 163-64, 167)

Whether Kovanda's story was a bluff or not, the threat of
Kaney losing its most important customer, and thus going out of
business itself and being unable to pay off the Harris loan, was
apparently enough for Harris to approve a $680,000 loan from
Kaney to Premier (the previously unauthorized $180,000 plus the
additional $500,000).  (Id. ¶¶ 124, 167)  But with Harris'
approval, and out of the negotiations between the parties, came
some fallout.  First, Kaney and Harris executed a forbearance
agreement dated October 12, 1999 that, among other things,
confirmed Kaney was in default on the original $7 million loan
from Harris due to Kaney's violation of certain covenants
contained in that loan agreement.  (Id. ¶¶ 104-06, 130-31; St.
Paul LR 56.1(a) ¶ 24)  According to Larry Mizera, Harris'
"workout specialist" (a specialized type of loan officer) who was
assigned to the Kaney account, that loan would have been
immediately accelerated had the forbearance agreement not been
signed.  (Bell & Eyer LR 56.1(a) ¶ 160)  As it was, the
forbearance agreement gave the Kaney directors another ninety
days to refinance the loan; if not, the note on the original loan

would become due pursuant to a balloon payment on December 12, 1999. (Id. ¶¶ 132, 161)

Another consequence of the negotiations over the Kaney-Premier loan was that Bell and Eyer regained a majority interest in Kaney from Kovanda and Moats. In an amendment to the buy out agreement dated October 2, 1999, Kovanda and Moats transferred majority ownership control back to Bell and Eyer, who each ended up with 26% of Kaney's stock for a collective 52% interest between the two of them. (St. Paul LR 56.1(a) ¶¶ 21-22; Bell & Eyer LR 56.1(a) Exh. A, Eyer Aff. ¶ 36)

When the needed refinancing was not forthcoming by December 1999, Mizera granted Kaney an extension on the forbearance agreement, which soon turned into a second, and then a third extension. (Bell & Eyer LR 56.1(a) ¶ 179) As it turned out, these extensions, as well as Kaney's extension of credit to Premier, only postponed the inevitable. At the end of the third extension, on July 25, 2000, Harris sent a demand letter to Kaney terminating the forbearance agreement and prohibiting the company from making any further payments to Bell and Eyer under the $3 million promissory note. (Id. ¶ 207) Harris had the power to do this because, as St. Paul concedes, the bonded note was fully subordinated to the Harris loan. (Id. ¶¶ 75, 150-51) Kaney accordingly stopped making payments on the note after June 2000. (Id. ¶¶ 208-09) Once it did so, Bell and Eyer demanded St. Paul pay on the bond. (Id. ¶ 210) To date St. Paul has not made any

payments on the bond; likewise, the indemnitors - Kovanda, Moats, and Kaney - have not posted any collateral to cover St. Paul from any losses it will incur if it does pay out on the bond, despite St. Paul's demands to do so. (St. Paul LR 56.1(a) ¶¶ 30-31)

In the meantime, both before and after Harris had called the loan, efforts were being made to sell Kaney as a going concern. (Bell & Eyer LR 56.1(a) ¶¶ 184-85, 187-91) These efforts essentially stopped, however, on March 29, 2001 when Marathon terminated its hauling contract with Kaney. (Id. ¶ 197) In Mizera's words, this was "the straw that broke the camel's back." (Id. ¶ 198) To recover what it could, Harris liquidated Kaney's collateral, which netted approximately $2.1 million, leaving Harris short about $4.5 million on the original loan. (Id. ¶¶ 204-06)

### III. ANALYSIS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Remer v. Burlington Area Sch. Dist., 286 F.3d 1007, 1010 (7th Cir. 2002). With cross-motions for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in favor of the party against whom the motion under consideration is made. See O'Regan

v. Arbitration Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001). The court's function is not to weigh the evidence but merely to determine if there is a genuine factual issue for trial – one that can properly be resolved only by a finder of fact because it may reasonably be resolved in favor of either party. See Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462 (7th Cir. 2002) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

A. **Discharge of the Bond**

The primary dispute in this case is whether the bond St. Paul executed in favor of the Trustees (who for all practical purposes were Bell and Eyer) should be discharged. Under Illinois law,[2] St. Paul will be released from paying on the bond only if Bell and Eyer (the creditors) and Kaney (the debtor-principal) "entered into an agreement materially different from that contemplated by the instrument of guaranty." Alton Banking & Trust Co v. Sweeney, 481 N.E.2d 769, 773 (Ill. App. Ct. 1985); see also Roels v. Drew Indus., Inc., 608 N.E.2d 411, 413 (Ill. App. Ct. 1992) ("a guarantor is not released unless the essentials of the original contract have been changed and the

---

[2] Because the parties have assumed without discussion Illinois law controls this diversity action (although it is sometimes difficult to tell whether St. Paul has done so because of its citations to cases outside Illinois, including an unpublished case from a Washington appellate court no less), the court will do the same. See Checkers Eight Ltd. P'Ship v. Hawkins, 241 F.3d 558, 561 (7th Cir. 2001).

-9-

performance required of the principal is materially different from that first contemplated"). In other words, unless there is "some material change in the business dealings between the debtor and creditor-guarantee and some increase in the risk undertaken by the guarantor, the obligation of the guarantor is not discharged." Essex Int'l, Inc. v. Clamage, 440 F.2d 547, 550 (7th Cir. 1971) (applying Illinois law); see also Bernardi Bros., Inc. v. Great Lakes Distrib. Inc., 712 F.2d 1205, 1207 (7th Cir. 1983) (same); Alton, 481 N.E.2d at 773 (same). The "key variable" here is whether the guarantor was exposed to an "increase in the risk it originally undertook." Roels, 608 N.E.2d at 414. This is because

> [a] guarantor takes a risk in exchange for a benefit; when events beyond the guarantor's control dramatically increase the risk, [] the assumptions upon which the contract was founded are undercut. [United States Shoe Corp. v. Hackett, 793 F.2d 161, 162 (7th Cir. 1986).] The principle that a substantial increase in risk discharges the guaranty rests on the assumption that guarantors would not ordinarily tolerate a substituted increase in risk without seeking something in return. [Id. at 163.]

Roels, 608 N.E.2d at 414. As a general rule then, a surety is discharged when the principal obligor and obligee agree to a modification of the "principal obligor's duties pursuant to the underlying obligation" if the modification either "creates a substituted contract or imposes risks on the [surety] fundamentally different from those imposed pursuant to the transaction prior to modification." Restatement (Third) of

-10-

Suretyship & Guaranty § 41(b)(i) (1995) (formerly Restatement (First) of Security § 128(b) (1941)), <u>cited with approval in Chandler v. Maxwell Manor Nursing Home, Inc.</u>, 666 N.E.2d 740, 752 (Ill. App. Ct. 1996).

So was St. Paul exposed to an increase in risk after it issued the bond? St. Paul naturally says "yes" and its explanation why is quite simple. When Bell and Eyer regained their position as combined majority shareholders in Kaney in October 1999, they, as obligees, effectively controlled whether Kaney, the principal obligor, would continue making payments on the promissory note – payments Kaney was making *to them*. Pointing out that Bell and Eyer were not indemnitors on the bond and consequently would not be personally liable to St. Paul if Kaney defaulted on the note, St. Paul suggests they had no real incentive to make sure that did not happen. And because such a fundamental restructuring in the nature of the relationship between the obligees and principal took place without St. Paul's consent, St. Paul insists its obligation to pay the bond should be discharged.

This argument certainly has some superficial appeal. After all, and this is really St. Paul's main point, no bond company in its right mind would issue a bond knowing the obligee and principal were essentially one and the same. In the abstract it is hard to quibble with this. But St. Paul's theory ignores the reality of the situation in October 1999 and glosses over the

crucial question of whether, under the particular circumstances of this case, the change in ownership *in fact* subjected St. Paul to "fundamentally different" risks than it originally contemplated. In the court's opinion, the answer to *this* question is "no."

By October 1999 Kaney was in serious financial trouble and was in default on the Harris loan, due primarily to the $180,000 it transferred to Premier without Harris' authorization and also in part to the directors fees its board of directors had approved. (Bell & Eyer LR 56.1(a) ¶¶ 98-100, 106-107, 130-31) Had the forbearance agreement not been signed, Harris would have immediately accelerated the loan, which effectively would have meant the end of Kaney. Moreover, Harris would not have entered the forbearance agreement in the first place if Kovanda and Moats had not transferred majority control over Kaney back to Bell and Eyer. (Id. ¶¶ 123-25, 162) In Mizera's opinion, Bell and Eyer regaining a controlling interest in Kaney was essential because they were the only ones Harris had confidence in to turn the company around or at least get the best sale price for Kaney in order to pay off the Harris loan. (Id. ¶¶ 168-78, 181)

Also relevant is the fact that Harris allowed Bell and Eyer to continue paying themselves - i.e., having Kaney pay them - their monthly installments on the note after the forbearance agreement was signed, even though Harris had the right to demand that Kaney discontinue these payments. (Id. ¶ 178) No matter

how much it pained Mizera to permit this - because the money
Kaney was paying to Bell and Eyer was not going towards the
principal on the Harris loan, which, it must be remembered, had
priority over the bonded note - Mizera felt Bell and Eyer needed
to keep getting their payments so they would continue trying to
get what they could out of the company for purposes of paying
back the loan. (Id.) In fact, it is undisputed Kaney
consistently made payments on the note for the nine months or so
after October 1999 up until Harris called the loan in July 2000
and prohibited Kaney from making any further payments. (Id. ¶¶
208-09; Pl. Reply, p. 3)

Taken together, the court believes these facts show Bell and
Eyer's reacquisition of a majority interest in Kaney did not
increase the risk St. Paul undertook - i.e., the risk of the
promissory note going unpaid - and, if anything, the change in
ownership actually *decreased* that risk. As the narrative above
makes clear, Kaney had two choices in October 1999: either face
immediate default on the Harris loan or let Bell and Eyer become
majority shareholders again. The first option certainly would
not have done St. Paul much good. If Kovanda and Moats had not
transferred their controlling interest in Kaney to Bell and Eyer,
then Harris would not have entered into the forbearance
agreement, and Kaney would have had to pay off the Harris loan
immediately. And if that had happened, the same scenario that
took place in July 2000 inevitably would have taken place in

October 1999: Harris would have taken what it could by selling off Kaney's collateral and stopped Kaney from making any further payments on the promissory note, leading Bell and Eyer to make a demand on the bond. To make this point clearer, there is absolutely no evidence in the record that Kaney had enough assets in October 1999 to pay off both the Harris loan *and* the promissory note (remember that the note was second in line in terms of priority) but did not have enough in July 2000 to do so because Bell and Eyer had taken over the company. To the contrary, what evidence there is indicates Kaney was leveraged to the hilt and the collateral it possessed was not enough to pay off the Harris loan in full even when it was first obtained. (Bell & Eyer LR 56.1(a) ¶¶ 78, 146-47, 149) And the prospects of selling Kaney or liquidating its assets in October 1999 were no better than in July 2000 because, as Mizera testified, the state of the trucking industry throughout that time was "depressed." (Id. ¶¶ 152-55) Thus, if Bell and Eyer had not regained control of Kaney, St. Paul would have been in exactly the same position it is now, only nine months sooner.

With Kaney confronted by an immediate default on the Harris loan, a subordinated promissory note, and no means of paying off either, let alone both, letting Bell and Eyer regain control of Kaney could hardly have made matters worse from St. Paul's perspective. At that point, the chances of Kaney paying off the promissory note were next to nil. As it was, Bell and Eyer were

-14-

the only ones Harris trusted to act in Kaney's best interests. Mizera made this point when he testified that "[i]f it wasn't for Jere Eyer, the bank would not have continued as long as [it] did with this loan in default." (Bell & Eyer LR 56.1(a) ¶ 177) So the risk that Kaney would not make good on its promissory note to Bell and Eyer in fact decreased when they reacquired majority ownership because they were the only hope Kaney had of getting back on its feet and being able to pay off its debts. Reenforcing this conclusion is the fact that Harris specifically allowed Kaney to continue making payments on the promissory note even though it had the power to prohibit this.[3]

While it seems strange to say that putting a principal obligor in the hands of the obligee does not increase the risk that the obligor will continue to pay the obligee pursuant to the original underlying obligation, the court believes the particular and rather unusual facts of this case lead to that very conclusion. As a result, the court finds St. Paul is not discharged from the bond it executed in favor of the Trustees.

---

[3] What's more, although not relevant in assessing whether the change in ownership had any corresponding change in St. Paul's risk as of October 1999, it is possible with hindsight to see that St. Paul actually benefitted from the way things turned out. Kaney, while under Bell and Eyer's control, made an additional nine months worth of payments on the promissory note between October 1999 and June 2000, thus reducing St. Paul's liability on the bond by that same amount. These additional payments obviously never would have been made if Harris had accelerated the loan in 1999.

B. **Indemnification**

Having found that St. Paul is liable on the bond, St. Paul's alternative relief – indemnification from Kaney, Kovanda, and Moats – is a relatively simple matter. It is undisputed that, as part of St. Paul's consideration for executing the bond, these defendants entered into an indemnity agreement in favor of St. Paul. According to the terms of this agreement, these parties agreed to "indemnify [St. Paul] and hold it harmless from and against all loss, liability and expense, including, but not limited to , reasonable attorney fees, which may be incurred by [St. Paul] by reason of having executed or procured any BOND(s)." (St. Paul LR 56.1(a) ¶ 12)  The agreement also requires the indemnitors to deposit "upon demand . . . current funds with [St. Paul] in an amount sufficient to cover any contingent loss, liability or expense in connection with any BOND(s) executed or procured by [St. Paul]. These funds shall be used by [St. Paul] to pay such loss, liability or expense or be held by [St. Paul] as collateral security against loss on any BOND(s)."  (Id. ¶ 13)

No one questions the validity or enforceability of this indemnity agreement. Indeed, Kaney has effectively conceded its liability by not responding to St. Paul's motion for summary judgment.[4] Kovanda and Moats would have done just as well by not

---

[4] The court wonders how much good a judgment against Kaney ultimately will do for St. Paul since Kaney is out of business and likely broke, but that is neither here nor there for present purposes.

-16-

responding as their arguments to avoid the clear language of the indemnity agreement are feeble at best and deserve little attention. They essentially claim St. Paul's request for indemnification is "premature" for two reasons. First they say that what St. Paul *really* wants is subrogation against them but that it has no subrogation rights until such time as it actually pays on the bond. This completely mischaracterizes St. Paul's complaint. St. Paul is not asking for subrogation, but exactly what it says in Counts II - IV: indemnification pursuant to a written indemnity agreement Kovanda and Moats (and Kaney) signed as indemnitors. Kovanda and Moats also suggest St. Paul's request for indemnification (assuming that's what it really is) is improper because (again) it has yet to pay on the bond and because it is not yet clear the amount of fees and costs St. Paul has incurred. This argument is going nowhere. St. Paul's liability on the bond is exactly what the cross-motions for summary judgment are about and the court just decided that issue against St. Paul in the previous section. St. Paul will now be ordered to fulfill its obligations on the bond, and certainly the court can enter an order to that effect while putting off a calculation on the total amount of damages for a later time. In fact, that is just what the court will do. With that, the court finds the indemnitors - Kaney Transportation, Inc., KTI Holdings, Inc., Kovanda, and Moats - are liable for all of the losses, including costs and attorney's fees, St. Paul has incurred in

issuing the bond.

## IV. CONCLUSION

For the reasons stated above, the Trustees' motion for summary judgment is granted in favor of the Trustees on their counterclaim and Count I of St. Paul's complaint; conversely, St. Paul's motion for summary judgment is denied as to Count I of its complaint but granted as to Counts II - IV.

E N T E R:

*[signature]*

PHILIP G. REINHARD, JUDGE
UNITED STATES DISTRICT COURT

DATED: June 3, 2002